IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| AUDREY D. BURGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 3:05-0399 |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND OPINION**

Plaintiff has made a Motion for Judgment on the Record (Doc. No. 16) and the Defendant has made a similar Motion for Judgement on the Record (Doc. No. 16). For the reasons set forth in the accompanying Memorandum, the Plaintiff's Motion for Judgment on the Administrative Record is GRANTED to the extent that Plaintiff requests a remand and Defendant's Motion for Judgment on the Record is DENIED. Before the Court is the Plaintiff's Motion for Judgment on the Record and Brief, Document #16, and Defendant's Response thereto, Document #19.

Plaintiff brought this action pursuant to sections 205(g) and 1631(c) of the Social Security Act ("Act"), 42 U.S.C. § 405(g) and § 1383(c), to obtain judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying her application for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381-1383.

Plaintiff filed her application on August 29, 2001 (Tr. 64-67). Plaintiff alleged disability as of April 15, 1999, due to high blood pressure, diabetes, hearing loss, and knee and heel pain. (Tr. 64, 79). Her application was denied at the initial level on December 31, 2001 (Tr. 42-45) and at the reconsideration level, after review by a separate physician and disability examiner than the team considering her initial application, on February 6, 2002. (Tr. 48-49).

Plaintiff appeared and testified at a hearing before Administrative Law Judge (ALJ) William F. Taylor in Cookeville, Tennessee, on November 18, 2003. (Tr. 637-657). Plaintiff was represented by counsel at the hearing. Vocational expert Gordon Doss, Ph.D., also attended the hearing (Tr. 637). In a decision dated

March 22, 2004, the ALJ found that Plaintiff was not disabled within the meaning of the Act. The ALJ found that Plaintiff suffers from severe impairments and is not able to perform any of her past relevant work. (Tr. 29). The ALJ also found, however, that Plaintiff is not disabled under the Act because she still has the capacity to perform other work that exists in significant numbers in the national economy. (Tr. 29). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's timely filed request for review on March 30, 2005. (Tr. 6-8).

Plaintiff has timely filed a Motion for Judgment on the Administrative Record as directed by Magistrate Judge Griffin and to which the Defendant has responded.

Age, Education, Daily Activities, and Work History

Plaintiff was 48 years old at the time of the ALJ decision, which is the decision under review in this case. (Tr. 65). She is a high school graduate. (Tr. 71). She lives with her 25-year old daughter. (Tr. 65). She owns a vehicle and has a driver's license. (Tr. 65). She only has problems with driving if she is on a long trip. (Tr. 99). She shops for groceries and does chores, but reports that she must be careful in these activities. (Tr. 99).

In March 2001, Plaintiff reported that she enjoyed walking around the apartments and "chatting" on the computer, and spending time with her sister. (Tr. 71). The March 2001 report indicates Plaintiff was applying for industrial work and cashier work, but that she believed "she was having difficulty obtaining employment due to her size." (Tr. 72).

A March 27, 2001 vocational evaluation report, pre-dating her application for SSI benefits by five months, stated that Plaintiff "believes that she had had difficulties obtaining employment because of her size." (Tr. 70). Plaintiff last worked in her ex-husband's and father-in-law's chair shop business until April 1999 (Tr. 70), which is the date she alleges her disability began. The March 2001 vocational evaluation report states that Plaintiff worked in the family business "for 10 years until she divorced." (Tr. 71). It appears that it was her divorce that caused her to leave the family business, rather than an onset of disability. "I worked with my husband in his chair shop. We filed for divorce so I had to leave." (Tr. 79). At the chair shop, she "lifted and carried chair parts to about 30 feet off and on all day." (Tr. 80). Plaintiff's work in the chair shop involved lifting ten pounds at a time. (Tr. 91).

2

Evidence of Plaintiff's Severe Impairments

Plaintiff suffers from obesity. Her weight was 400 pounds as early as August 12, 1997, in a visit to Dr. Morgan (Tr. 152), almost two years before she left work at her husband's shop due to her divorce. Plaintiff reported that she has had longstanding obesity. (Tr. 213). Plaintiff has diabetes. She reports she was diagnosed with diabetes in 1996. (Tr. 213).

Plaintiff suffers from knee pain, but notes that she treats it with Tylenol, which provides relief in about 30 minutes time, and provides relief for about four hours. (Tr. 98). Plaintiff's daughter corroborated her Tylenol use for knee pain and the relief it provides, and noted that sometimes Plaintiff uses a heating pad. (Tr. 106). Plaintiff's daughter reported that Plaintiff's knee pain began around 1996 or 1997, at least two years before Plaintiff left work due to her divorce, and that the nature of Plaintiff's knee pain has not changed since then. (Tr. 108).

On June 26, 2001, Plaintiff saw Dr. John McPherson in a cardiac clinic for chest discomfort. Dr. McPherson stated he believed her symptoms were "most likely due to gastroespheageal reflux disease given that they occur exclusively when she lies down at night." (Tr. 206). On September 26, 2001, Dr. Andrew Dean reported that he "saw no significant diabetic retinopathy" in Plaintiff, however, she did show some early macular degeneration and urged her to have yearly eye exams. (Tr. 430).

On October 10, 2001, Dr. Timothy Fisher examined Plaintiff and reported that Plaintiff "has no neurological deficits noted on evaluation." (Tr. 216). Dr. Fisher did not see any restrictions regarding gripping or manipulating objects. (Tr. 216). On November 27, 2001, Dr. Fisher reported that Plaintiff's right knee had a "decreased compartmental space noted on the medial compartment compatible with moderate degenerative arthritis." (Tr. 217).

On December 18, 2001, Dr. Hamsaven Kambam reported on a functional capacity assessment form that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds. (Tr. 229). As noted above, Plaintiff herself reported lifting 10 pounds throughout her work in her husband's chair shop. In June 2002, Plaintiff had a partial hysterectomy. (Tr. 292-293). On June 24, 2002, she was reported as having "[t]otal deafness in right ear, small amount of deafness in left ear." (Tr. 122). On February 12, 2003, Plaintiff was seen at the McMinnville Orthopaedic Clinic, which assessed her as suffering from "[b]ilateral osteoarthritis of

3

the knees." (Tr. 382). Plaintiff declined to receive knee injections because she did not believe her discomfort was severe enough for such treatment. See the report of Dr. Arms at Tr. 424 ("We discussed various treatment options including an injection series but she states that her current level of discomfort did not warrant an invasive procedure to the knees.")

On June 17, 2003, Dr. Jeffrey Marvel reported that Plaintiff "is profoundly deaf in the right ear. Hearing loss in the left ear is mild. This would impair her using a phone in the right ear, and understanding some conversations directed to the right ear." (Tr. 503). On June 25, 2003, Dr. John McPherson reported that "Plaintiff appears to be doing fairly well from a cardiac standpoint. She is asymptomatic and has well controlled blood pressure. In addition, her lipid profile was quite favorable last time." (Tr. 427).

On July 7, 2003, Dr. John McPherson, after examining Plaintiff, reported that she was a "[p]leasant woman in no apparent distress" and that she had a "[n]ormal range of motion." (Tr. 511). His impression was that Plaintiff "continues to have worsening edema." (Tr. 512). On Jul7 17, 2003, Dr. Jacqueline Aune reported that Plaintiff could occasionally lift and/or carry 20 pounds, and frequently could carry 10 pounds, and has no manipulative limitations. (Tr. 532).

On August 26, 2004, Dr. John Cauthon reported that Plaintiff's foot pain was "almost completely gone." (Tr. 575). He also reported that Plaintiff's gait was stable and that his inspection and palpation of bones, joints and muscles was unremarkable. (Tr. 576). On July 16, 2004, Dr. Craig McCabe reported that Plaintiff did not have diabetic retinopathy or clinically significant macular edema. (Tr. 633).

Statement of Errors:

As directed by Magistrate Judge Griffin, Plaintiff has set forth her statement of errors as follows:

1. Whether the Administrative Law Judge (ALJ) erred in finding that the plaintiff had the residual functional capacity to perform a significant range of light work.

2. Whether the ALJ erred in failing to find that the plaintiff met Listing 1.02A.

3. Whether the ALJ erred in failing to consider the combined effect of plaintiff's multiple impairments, including pain.

4

4. Whether the ALJ erred in rejecting the opinion of the claimant's treating physicians.

5. Whether the ALJ erred in not finding the plaintiff's testimony to be fully credible.

6. Whether the ALJ erred in applying the Grid Regulations to reach a conclusion of "not disabled."

7. Whether the ALJ erred in finding that a significant number of jobs existed in the regional economy that plaintiff could perform.

Plaintiff's issues raised are addressed as follows:

1. Whether Plaintiff had the Residual Functional Capacity (RFC) to perform a significant range of light work:

The ALJ found that "[t]he claimant has the following residual capacity: lift and carry twenty pounds occasionally and ten pounds frequently, and she requires a sit or stand option." (Tr. 28). He also found that the "[t]he claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967)." (Tr. 29). Plaintiff cites to a medical assessment form in the record (Tr. 537) stating that she is limited to occasional lifting of 10 pounds to argue that the ALJ's RFC finding is incorrect. The ALJ specifically addressed the medical assessment form to which Plaintiff cites, but gave it no weight due to its manufactured nature and the inconsistency between Plaintiff's purported limitations as stated on the form and the ALJ's own observations. The ALJ explained that he "gave the opinions of Dr. Morgan found at (Tr. 537) no weight as the claimant's attorney stated that she assigned the limitations to the claimant, and Dr. Morgan signed the form." (Tr. 26). AT the ALJ hearing, Plaintiff's attorney forthrightly explained how little attention Dr. Morgan paid to this form and how little he had to do with the limitations noted on it.

> ALJ: ... the medical source statement from Dr. Morgan?
> ATTY: Um-hum.
> ALJ: Is Dr. Morgan a treating physician?
> ATTY: Yes.
> ALJ: Did he complete this?
> ATTY: Well, yes, I tried [INAUDIBLE], when I was down there, I let him.
> ALJ: He signed it?
> ATTY: Well, no, he marked all over it, as you can see.
> ALJ: Well, he made some notations.
> ATTY: Yeah, I had a hard time even getting that, he told me not to make a habit of coming to see him.
> ALJ: Kind of curious about that because he put some limitations down here that are extremely significant. For example, reaching and handling and feeling, and I've already seen the claimant move around, carrying a purse, holding, flipping through a folder over there. So–
> ATTY: Well, she –
> ALJ: A little bit different than what the doctor says in here. (Tr. 637-638).

5

The Administrative Law Judge discounted Dr. Morgan's asserted limitations. The Administrative Law Judge found the reports of both Dr. Aune (Tr. 532) and Dr. Kambam (Tr. 229) consistent with his findings and contradictory to the opinion of Dr. Morgan.

The Administrative Law Judge did not err in finding Plaintiff had the residual functional capacity (RFC) to perform a significant range of light work.

2. Whether Plaintiff does not meet Listing 1.02A:

Plaintiff has been obese for a number of years. She weighed 400 pounds years before she ever left work in the family chair shop due to her divorce. Plaintiff claims that the ALJ erred by not finding that she meets Listing 1.02A due to her obesity. By citation to Listing 1.02A, it appears that Plaintiff contends that her obesity prevents her from ambulating effectively, and that she believes her ambulatory limitation rises to the level described in Listing 1.02A. Plaintiff is correct that obesity can be so severe that it may substitute for the major dysfunction of a joint and prevent effective ambulation under the Listings.

> For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence.

SSR 02-1p

Here, there is no evidence in the record supporting the contention that Plaintiff's ambulation is impaired to the extremely severe degree described by Listing 1.02A.

Listing 1.02A concerns a category of musculoskeletal impairments. It provides as follows:

> *Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b ....

6

Listing 1.02A, 20 C.F.R. Part 404, Subpart P, Appendix 1 (emphasis added). This joint dysfunction (or obesity equating to such dysfunction) must result in an inability to ambulate effectively as defined in 1.00B2b. The definition of inability to ambulate effectively is extremely severe, as evidenced by the following definition.

>    *b. What We Mean by Inability to Ambulate Effectively*
>
> (1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) *To ambulate effectively,* individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 1.00.2.b.1&2, 20 C.F.R. Part 404, Subpart P, Appendix 1.

There is no evidence that Plaintiff's ambulation is affected to the severe degree described above, either due to her obesity or her knee pain. Plaintiff complains of knee pain, but admits her pain is relieved for up to four hours at a time by taking Tylenol. (Tr. 98). Plaintiff still engages in grocery shopping and household chores, and says her knee only bothers her when driving if going on a long trip. (Tr. 99). She said she cannot walk for long periods of time and that when she worked she "sat down instead of standing." (Tr. 99). Dr. McPherson reported that Plaintiff has a normal range of motion. (Tr. 511). Dr. Fisher reported that her knee exam was compatible with "moderate degenerative arthritis." (Tr. 217). Plaintiff herself declined injections to her knee because she did not believe her knee discomfort was of a severe enough level. (Tr. 582). There is no evidence of

record that she requires assistive devices to ambulate. In fact, even when Plaintiff was in the hospital recovering from her hysterectomy, it was reported that she was ambulating without assistance. (Tr. 320). The Administrative Law Judge did not err in this finding.

3. Whether the ALJ considered the combined effect of Plaintiff's impairments:

The ALJ found that Plaintiff suffers from several severe impairments, including diabetes, hypertension, obesity, osteoarthritis of both knees and a hearing impairment. (Tr. 28). The ALJ found that Plaintiff's combination of impairments are so severe in fact, that she cannot perform her past relevant work. He obviously considered the combined effect of Plaintiff's impairments. This assignment of error is without merit.

4. Whether the ALJ properly credited treating physician opinions:

Plaintiff alleges that the ALJ erred by failing to give proper weight to the opinion of Dr. Morgan, that the ALJ misrepresented an opinion of Dr. Morgan at Tr. 24 (Pl.'s Brief at 14-15), that the ALJ ignored an opinion of Dr. Fisher (Pl.'s Brief at 15-16), and that the ALJ improperly relied on opinions of Dr. Kambam and Dr. Aune (Pl.'s Brief at 16).

The ALJ relied on Dr. Morgan's diagnoses to find that Plaintiff suffered from several severe impairments, but discounted the functional limitations noted on one form that were inconsistent with other evidence of record and the ALJ's own observations, and made a determination regarding whether Plaintiff was disabled under the Social Security Act based on all the evidence. The ALJ did not err in this finding.

5. Whether the ALJ's credibility finding was correct:

The ALJ found Plaintiff to have several severe impairments, and to be so impaired that she could not return to her previous work. Clearly, the ALJ found Plaintiff to be credible with respect to the existence of her impairments. He only found her incredible to the extent that she claims she is totally unable to do any *other* work. The reports of Dr. Aune (Tr. 536) and Dr. Kambam (Tr. 229) are consistent with and support the ALJ's functional assessment, and are contrary to Plaintiff's claim of not being able to do any work whatsoever. The record reflects that Plaintiff left work in 1999 due to her divorce and not because she was too impaired to work (Tr. 71) and that she applied for jobs in March 2001 and believed she did not

8

get them due to her size. (Tr. 70). There is substantial evidence in the record to support the ALJ's finding that Plaintiff is not totally credible when she claims that she is too impaired to do any job.

      6. Whether the ALJ properly used the Medical-Vocational Rule 202-21:

Plaintiff alleges the ALJ applied a Medical-Vocational rule improperly. In fact, he did not strictly apply the Medical-Vocational rule. The ALJ found that Plaintiff could perform "a significant range of light work," not all light work. (Tr. 29). The ALJ noted that he was using the Medical-Vocational Rule "as a framework for decision-making." (Tr. 29). The Medical-Vocational Guidelines explain that they direct a conclusion as to whether a person is disabled "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all the criteria of a particular rule." Medical-Vocational Rule 200.00(a), 20 C.F.R. Part 404, Subpart P, Appendix 2.

However, even when no specific rule applies, the Medical-Vocational rules "still provide guidance for decisionmaking, such as in cases involving combinations of impairments." Medical-Vocational Rule 200.00(d). The adjudicator can still use the grid rules as a "frame of reference." Plaintiff claims she has non-exertional limitations related to breathing difficulties. The ALJ factored in these limitations in his questioning of the vocational expert, when he noted in his hypothetical that the individual "should avoid concentrated exposure to fumes, odors, dust, gas, places with poor ventilation." (Tr. 653). Thus, the ALJ knew that the grid rules could not be mechanically applied to Plaintiff's case, and he did not do so. This objection fails.

      7. Whether the ALJ properly made a finding about other work:

Plaintiff alleges the ALJ erred in finding that a significant number of jobs exist that Plaintiff could perform. Plaintiff's real complaint here does not appear to have anything to do with the actual step-five analysis, however, regarding the existence of other work in the economy. She does not question the vocational expert's credentials (Tr. 61-62) or note any problems with his testimony (642-643, 652-655). Rather, her real complaint here is that she seems to take issue with the ALJ's residual functional capacity assessment that is used in the step-five analysis, that is, she believes she is more limited than the ALJ found. That issue is discussed above. There is substantial evidence

9

in the record to support the ALJ's functional capacity finding and credibility finding.

This Court may not weigh the evidence anew but must look to whether there is substantial evidence to support the decision of the Commissioner. There clearly is. Therefore, the decision of the commissioner is **AFFIRMED**. Plaintiff's Motion for Judgment on the Record, Document #16, is **DENIED** and judgment shall enter for the Defendant Commissioner.

It is so **ORDERED**.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge

10

Case 3:05-cv-00399   Document 20   Filed 08/31/07   Page 10 of 10 PageID #: 68